Case numbers 243262 and 243409. United States v. Arthur Fayne. Argument not to exceed 15 minutes per side. Mr. Croucher, you may proceed for the appellant. Good morning. Good morning, Your Honor. May it please the Court, my name is Paul Croucher. I'd like to reserve three minutes for rebuttal. Very well. Your Honor, I have the honor to represent Mr. Arthur Fayne. An initial issue I'd like to bring to the Court's attention is that Mr. Fayne is currently in prison. I believe the record demonstrates that he is, in fact, an innocent man. He has five more months before he would go to halfway house. I would ask the Court, this panel, to order his immediate release pending the actual release of the decision in this matter. Do you have a formal motion to that effect? I did, Your Honor, and I made the motion. The motions panel decided that I had insufficiently argued or addressed the facts of the case. So this panel, having now all the facts of the case, I believe, pursuant to U.S. v. Sittenfeld, can and should release Mr. Fayne. Okay. Did the motions panel deny the motion? They did, Your Honor. Okay. So, I mean, you can renew the motion before us, but you haven't filed a formal motion. Is that right? I have not, Your Honor, and largely based upon what happened with Councilmember Sittenfeld's case. I believe that a written motion, a third written motion, would be superfluous. But I'm pretty passionate about this because Mr. Fayne was sort of convicted based on innuendo. There was no material misrepresentation. This is a wire fraud case. And the U.S. did not present any material misrepresentation by Mr. Fayne. He submitted bills. The bills were paid. Their claim that he's guilty is based upon a delay in paying the contractors. Now, the U.S. argues that state law on how long it takes to pay the contractors is irrelevant, but I think it really matters. I thought the argument was that he never really did. I mean, he skimmed some money off the top, used it to go gambling or whatever, and then the city of Cleveland had to make them whole. Actually, Your Honor, no. That's not their argument, or that's not what happened? That's not what happened, and that's my argument. Okay. The U.S.'s trial brief says the Grants had nothing to do with this case. They said in their record entry number 37 in their trial. I'm sorry. Are you saying that Mr. Fayne paid all the money that was due to the contractors at issue, Crescent Digital and AMH? Your Honor, Higley was paid. It got kind of complicated. Oh, I'm asking did Mr. Fayne pay all of the money, not whether they were paid.  Actually, he didn't, because this is where it gets complicated, and the problem of restricting the evidence to 13 months that the U.S. asserted versus the 23 months of the indictment versus the 33 months of the project. There was a work stoppage caused by having to wait for the grants to come in. After the work stoppage, Neon took over paying, but they didn't require Fayne to go back and directly pay those. He paid other entities, and the evidence showed from the defense expert that he, in fact, did pay other bills. There were lots of contractors. This wasn't just Higley as the only contractor. CDC was fully paid. The communications entity that later refunded part of the money to him because they said they hadn't earned it, but that entity had made a net due within 30 days full amount requirement, and their actions after that had nothing to do with it. I don't understand what the entities being fully paid have to do with whether your client committed wire fraud, particularly because Mr. Fayne didn't pay all the money to them. It came from governmental entities, grants, and things of that nature. Right. This is where, had they been able to go into that, the problem was the judge wouldn't let them go into why did Neon take over the payment of some of the bills and leave Fayne to pay others of the bills. Clearly, from the expert report, Fayne paid more money over the entire course of the project than was billed, actually. Higley received more money than it had actually billed. You're saying Fayne paid more money to Higley than was actually billed. No, Payne paid more money total on the project. Had they been able to go into anything other than the 13 months of the U.S.'s evidence and go into even the period of the entire indictment, they could have shown why did Neon take over paying Higley and leave Fayne to pay the other creditors, the other contractors. They couldn't do that. The U.S. objected and the Patrol Court sustained the objections to going into any of that. Why did this happen? We have a limited record, but all we have is Fayne took the invoices from the contractors, put a cover sheet or summarized them in a cover sheet that there's no allegation that the cover sheet was incorrect, submitted that to Neon and to CIS, its subsidiary, took the money, didn't immediately pay it to anyone. So he deposited it in his account. He's a single-member LLC. Deposited it in his account. Granted, used it for personal expenses, but ultimately didn't make any false representations to anybody. He didn't hide it. He wasn't pretending that he'd paid them. He didn't falsely issue paid-in-full receipts or anything like that. Neon, CIS, their witness testified that the expectation was when an invoice is sent to them, they send the money. The idea was the money goes directly to the contractor. Yes, Your Honor. Well, it wasn't directly to. I expected them to be paid. There's no representation by Fayne as to when that would be. If I get a check from somebody that goes into my IULTA account, then I can't touch it for personal expenses, right? It has to go to the party, the intended recipient. And had Fayne represented that he would on a particular day pay this bill, sure. But there is no such representation. There's no statement by him, and that's right in the statute. There has to be some sort of, and in all the cases that we talked about in the briefs, there's some material misstatement. And there just simply is not. There's an expectation that he would promptly, and then so the question is, at what point does that expectation switch from even being a normal course of business to being a civil lawsuit to being a criminal case? Are we going to pick a date of a year? Is it six months? Is it a month? Where is that? Now, if Fayne had said, Mr. Ross, now I'm going to pay this immediately, still, I don't know what immediately means, but immediately upon receipt, immediately upon clearing, something like that, maybe so. But he didn't. He truthfully said what the bill came in at. No, what if he did say that? What if he said I'm going to pay the money immediately? Do you think that would satisfy the wire for our statute? If he'd said I was going to pay it immediately? Possibly, though, when you're talking about money flowing, when is immediately? When it clears, seven days, ten days, 30 days, 45 days, it still is up to there. But there had to be some sort of representation about that. Some, even an implied lie. But here there simply is no representation. And thinking about the trial brief that the U.S. submitted brings up the restitution issue. The court ordered restitution on an issue that the U.S. had admitted before the trial, and, in fact, the trial court had restricted testimony on about these grants because the defense expert's first opinion was about the grants, first opinion letter. The U.S. said grants are irrelevant. We're not talking about the grants here at all. And then on the back end, the U.S. asked the court to order restitution of the grants, even though the grants had nothing to do with anything in this case. So I think we have a fundamental mischaracterization and misapplication of all those funds. Yes, Fain was irresponsible. Should he have paid it immediately? Probably. Is it criminal? Is it wire fraud when he didn't say anything that was false? The fact that people expected things is not the hallmark of fraud unless he induced it. Had there been evidence that he induced that fraud? Maybe so. But I've got nothing here. And so if we had been able to talk, if defense counsel had been able to talk, say, about what? So Mr. Austin, they're starting to talk about the contractor fees having been fully paid, objections sustained. You can't talk about that. Well, if . . . I thought there was testimony at the trial that everybody had been paid in full, or at least the defense argued it. The expert, didn't the expert say something about that too, that everybody had been paid in full? There was a couple of side references that slid in that were not objected to by the U.S. that said that, yes, Your Honor. Every time the defense, every time the prosecution objected to it, however, the trial court sustained it. So it's like the jury, I don't think the jury are stupid people. They see that every time the defense tries to argue this, and there's an objection, the court sustains it and says disregard. So just the fact that they got to slide in a couple of references to it, is that enough to ameliorate the problem that they didn't get to fully address it? They never got to talk about why Neon took over paying Higley. And that really is a crucial point in the case. I think if there was to be a retrial, that would be the most important issue about it's complicated, and I think that the trial court wanted to avoid the complication is why he said you can't talk about it. But really it is the gist of the issue. The heart of what happened here was this interplay of payments. You don't get to go into the interplay of payments, 33 months of the project, 23 months of the indictment, but yet we're restricted 13 months about talking about it in front of the jury, except when the prosecution wants to jump out of that and talk about something else that happened, which they repeatedly did. They kept going around, but yet the defense, and the defense by the time they know that the prosecution's going to limit them to 13 months, because it wasn't like a preliminary hearing or anything, there's no notice that they were going to be restricted to 13 months. They think it's a 33-month project. They think it's a 23-month indictment period. So I think we've got some serious problems here. The key is should he be in jail now? Should there be a restitution order for $840,000? Yes, he's got five more months before he goes to halfway house. Why should he do five more months when he never said anything that would cause he never made a misrepresentation? And thank you. Thank you. Any further questions at this time? Thank you, Ron. You'll have your three minutes rebuttal. Thank you, sir. Let's hear from the government. Good morning. Good morning, Your Honors. May it please the Court, Laura Ford on behalf of the United States. I'd like to begin by addressing Fain's wire fraud convictions, which was based on conduct that was not within the ordinary course of business, whether you're looking at it in 13 months, 33 months, as he would like the court to look at, or some indeterminate amount of time. Whether you call it misappropriation, embezzlement, larceny, or something else, the evidence showed that he was using wires to effectuate a scheme to defraud the project developer, in this case, by billing for construction costs. It was supposed to go for those expenses. And when he received the money, he would run down that money and use it for a different purpose without disclosing it. And that is what satisfied the specific intent to defraud element for wire fraud, because he was making material misrepresentations for the purpose of depriving the victim of the money. And this court has found that even depriving the victim of the money in the short term... Would you be allowed to present this defense of, hey, everybody got paid eventually. It was just a matter of me not giving Higley all of its money, but they got it. I had to use the money to pay somebody else. No, Your Honor. I mean, whether somebody else eventually... Did he present that to the jury? He did present the theory that the contractors were fully paid. He was able to talk about Higley being paid in opening. Austin testified that Higley had been fully paid, and the company's owner said, yeah, we've been fully paid. So that did come out even despite the fact that the court said they were going to limit it to the 13 months. That did fully come out. And he highlighted that in closing at page ID 2488 to 89, and I believe it was 2476 to 78. But whether another party ended up paying like Cleveland or the county is really irrelevant. The government's position is that he made misrepresentations about how this money was going to be used. By asking CIS to pay for the construction and development costs for the prior month, and then he would itemize each contractor and list Higley. He was paying the other contractors, but then he was skimming the money that was supposed to be going to Higley. And whether you look at it at 13 months or 33 months or some other time frame, the point is that he actually never paid that money. I mean, he admits even, which is not relevant for his conviction, but even at the restitution hearing, he admits that the money, the $759,000 that was owed to Higley came from Neon. It didn't come from him. So even if you said that the fact that there's no loss in the end was somehow relevant, which is not under this court's Daniel decision, it doesn't defeat the fact that he made consistent misrepresentations by coming up with these invoices without supporting documentation, saying that this was for a specified purpose, for the construction costs. And then he turns around as soon as this money hits his account seven times. I think the government's not taking the position, though, that any misrepresentation is fraud, like there's some materiality aspect, right? Correct. And I guess the question I would ask is if it's just a timing question, is that material? I mean, I'm curious what your position is because I'm... Sure. I think you use reasonableness. I mean, the materiality piece is kind of the guardrail. And, I mean, if it was just a slight delay, I don't think we'd be here. But here, I mean, his focus on his 33 months doesn't even work for him because he never paid that money back. And we apply reasonableness. I mean, I take it the position is somebody had to make up the difference. Somebody had to pay. It was paid twice. Some amount of money was paid twice, right? Yes. Which means somebody was out of pocket when they shouldn't have been. Yes, which is why there was a mandatory restitution order in this case. But, I mean, the elephant in the room is that he personally never repaid it. I mean, there was no evidence of that. And this is not the ordinary course of business. That's what he wants to say is, oh, this is normal. There's nothing normal about hanging on to money or using it for a different purpose. When you say, I need it for these construction costs to pay our main contractor and then spending it for something else the very same day for every one of those seven invoices that he created, he is going in and spending it for personal expenses the very same day and every single time. Same thing for Crescent Digital. When he gets this $125,000 that's transferred with the understanding that it's going to be repaid closer to the time of completion, he, the very same day it hits his wife's account, he's using it for a different purpose. And, you know, we have Austin's testimony in terms of NEON and CIS that's saying, no. You know, I expected that anything that said Higley on this invoice was going to be paid to Higley as indicated, and I wouldn't have authorized this for gambling or personal expenses. And that's where the materiality comes in because this representation that this is what the money is going to go for, that's what the victims relied on. And so it would just defy logic to say that you could spend it for a different purpose and not repay it for 13 months, for 33 months, some indeterminate time frame. And so this framework doesn't even work for him because he never repaid it, and I would just say the repayment is not even relevant under this court's case law in the Daniels. But Higley is not a victim, are they? The victim is NEON or the city of Cleveland or whoever, right? Yes. As opposed to Higley. Correct. So CIS is the victim that paid the money over to Fain, and the money was supposed to go to Higley. It doesn't. And so, as you pointed out, there has to be a double payment because they've already paid it once, presumably for the Higley. It doesn't go to Higley. It goes to Fain. So now there's $759,000 that still needs to be paid to this contractor to get this project going, to complete it. And so they have to pay it a second time. So, yes, they are the victim in that case. Same thing for Crescent Digital. That's the victim because the money was received early for this contract before the work was done, and the owner was saying, look, I'm really not comfortable with this. This isn't how we normally do business. You know, Mr. Fain, would you mind if we give this back to you for holding until we get closer to finishing this project? He outlines it in an email saying, look, we'd like two equal payments when we get closer to it. And so Fain gives directions for it to be transferred to his wife's personal account because there's creditors and that money would have been taken if it had gone to Arthur Fain. And as soon as that money hits the account, then Arthur Fain is spending the money. And it was not repaid. But I would disagree that there wasn't any misrepresentation. The point has always been that he was misrepresenting how this money was going to be used. And those were material misrepresentations. And he absolutely misrepresented how the money was being used. In fact, he was blaming the delays on the city of Cleveland. And then he also said that there was overruns. That, too, is not in the ordinary course of business. And then two months before trial, there was evidence that he was trying to get neon CFO to change the financial records to reduce, according to the records, how much they had given Fain's company by $1.1 million. That, too, is not the ordinary course of business. And the jury didn't have to take the government's word for it about what would be the ordinary course of business. You have Vaughn, the owner of Higley, saying, look, we would normally expect payment within 30 to 45 days. And then Crescent Digital, my client, says, yeah, we would normally expect payment in 30 days as well. And so the evidence in this case and the juries reflected that there were material misrepresentations for all counts. And we would ask the court to affirm his convictions on that. And I would also ask the court to deny his request for release. If my memory serves me correctly, there's already been two requests for release. One was before a motions panel, and then I believe when Mr. Fain filed his brief, he asked for release again, which was denied. And so it's already been denied twice, and we do not believe it's appropriate at this time. And because there was no evidence that Fain ever repaid the $759,000 that he misappropriated, the court correctly found the mandatory restitution was due for that amount. Also, there was a P&C equipment loan that Fain caused CIS to obtain that went to Crescent Digital. It ended up, there was about $38,000 that went to repaying a payroll loan that Hines had given Fain, and also $13,000 for a finder's fee, which Austin, neon CEO didn't know about, would not have authorized. So that is where the $807,000 for the restitution, and then there were still two unpaid invoices to Crescent Digital, which would not have been but for this misappropriation of the $125,000 that got transferred. The court correctly found that that was mandatory restitution under Section 3663. And it also found that, with respect to CIS, that it fell under the segregation and indemnification provision under 3664J1, which shifts the restitution payment when the victim has received compensation from another source with respect to the loss. And here you had the infusion of funds coming from Cleveland and from the county, which functioned to offset the loss that CIS suffered because they had to make this double payment. And unless this court... Any questions? All right. Thank you, Your Honors. We'd ask that you affirm the convictions and the restitution obligations. Thank you. Rebuttal, three minutes. Thank you, Your Honor. Key question. If there was double payment, who double paid? Mr. Austin denied ever having double paid, and he was the CEO of NEON and CIS. The government, in its trial brief, pages ID 153, 154, says the grants, the funding has nothing to do with the allegations of the complaint. The United States has not alleged that any expense reimbursements related to the Eastside Market Project were submitted inappropriately or not in accordance with the grant documents. So if NEON and CIS did not double pay and the government says that the city and the county did not double pay, shouldn't we be able to say who double paid? If the trial had been able to go into those other periods of the duration of the contract, we probably would have found out, been able to account for the things. That's what the experts are for, but the FBI special agent and the defense expert never got to really go into that except for references that seem to have nothing to do with the complaint. There's so much about what he did with the money in the trial. That seemed to be the focus and the defense objections to going into Mr. Fain's tax problems, going into his lifestyle as though the lifestyle or tax problems would in any way have been relevant, and yet the trial judge let that in because he seemed to think that was relevant, but it's not relevant. Why NEON took over paying Higley, where that funding came from, how is it double paid or not double paid? If it never gets into that, I don't think you can properly find anything other than that there's open questions. And if we got to go back and retry it, I believe that maybe we could answer that question and address that issue. So I don't think we have a victim. If we don't have a victim, yes, there are victimless crimes, but I don't think you can have a fraud as a victimless crime. Someone has to have been defrauded in order to have fraud. It's an interesting question. What the government says is the expectations of the contractor determine that it's fraud. So if those expectations, in this case, maybe that was a reasonable expectation, but what if the contractor had an unrealistic expectation that you would wire me the money instantly? Is not meeting that unrealistic expectation fraud? And how would anyone know? How would we have a rule of law if we don't know what it means to commit fraud, if we don't know what we're allowed to say, what we have to say, what we can't say? All we have is a bare-bones one-page or set of bare-bones one-page invoices that said, and correctly, never misrepresentation on those, these are the invoices I received, please remit. I can understand if he'd added a one to those invoices, fraud. But someone's expectation is going to be bound by and you're going to put him in prison for 18 months. Any further questions? All right. Thank you, counsel, for your argument. The case will be submitted.